UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10337-RWZ

UNITED STATES OF AMERICA

v.

KRISTOPHER GRAY

ORDER ON MOTION TO SUPPRESS

June 24, 2008

ZOBEL, D.J.

Defendant Kristopher Gray ("Gray") is charged with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress all evidence resulting from a police stop on September 19, 2007. Based on the parties' motion papers and after an evidentiary hearing, I find the following facts.

**I.      Findings of Fact**

Detective Sergeant John Fitzgerald ("Fitzgerald") of the Boston Police Department is the Detective Supervisor of the Youth Violence Strike Force ("Strike Force"). In this capacity, he determines the particular areas the Strike Force will patrol and surveil. On the evening of September 18, 2007, members of the Strike Force recommended surveillance of an apartment building located at 37 Hendry Street in Dorchester, Massachusetts, because a large group of people, some known to the officers, were congregating around the building. Fitzgerald testified that Hendry Street

was an area of particular interest to the Strike Force because, <u>inter alia</u>, he has recovered guns and drugs on Hendry Street in the past; he has made prior arrests on the street for aggravated assaults; and a shooting had occurred on the street within the previous twenty-four hours. Fitzgerald began his surveillance of 37 Hendry Street shortly before midnight on September 18. He sat in an unmarked car approximately 700 feet away and used binoculars to watch the individuals congregating outside the building. Hendry is a dead-end street, with No. 37 at the end of the street and a wooded area behind it. Fitzgerald testified that moving his car closer to 37 Hendry would have alerted the group to his surveillance. Several other members of the Strike Force sat in a Ford Explorer and a Crown Victoria a few blocks away. Fitzgerald maintained contact with these members by both Boston Police Channel 12 and Nextel Direct Connect®. Fitzgerald was the only member able to observe No. 37 Hendry.

Fitzgerald saw approximately six to twelve individuals, including defendant, in front of 37 Hendry Street. Defendant wore a bright red do-rag and red sweatshirt. Fitzgerald saw defendant walk from the steps of the building down to the street and adjust his waistband. Based on his experience and training[1] Fitzgerald believed that

---

[1] Fitzgerald has been an officer for twelve years, and he was part of a citywide drug control unit for eighteen months prior to his promotion to Sergeant and his assignment with the Strike Force. During this time he has made hundreds of arrests for drugs and guns and has seen guns carried unholstered in waistbands on many occasions. He has also completed an 80-hour training program sponsored by the DEA which focused on drug distribution, as well as annual training sponsored by the ATF which focused on the characteristics of armed gunmen. In addition, he has carried an unholstered gun in his waistband while working undercover.

the adjustment suggested defendant was carrying a weapon in his waistband.[2] He contacted Boston Police Officer Christopher Ross ("Ross"), who was in the Ford Explorer and had been watching the group earlier in the evening. Fitzgerald described defendant and his clothing, and Ross and the other members of the Strike Force in his car, including Boston Police Officer Anthony Serra ("Serra") and Massachusetts State Trooper Jimmy Grasso ("Grasso"), identified him as Gray, whom they had seen earlier in the evening wearing a red do-rag and sweatshirt and with whom they were familiar from their regular patrols of the neighborhood and from an arrest several years earlier. Fitzgerald saw defendant and another person walk towards the back of the building through an opening in the fence on the left side, and then emerge again approximately one minute later. Defendant walked back up the stairs of the building and the other person walked away. Fitzgerald observed defendant again adjust his waistband, then again walk to the back left area with an individual who arrived on a bicycle, emerging a moment later. Defendant adjusted his waistband both before and after his trip to the back of the building. I find Fitzgerald's recounting of these events fully credible. At this point, Fitzgerald told the rest of the Strike Force members that he believed defendant was armed and conducting drug deals. The team decided that the next time defendant went to the back left area they would approach and make a "threshold inquiry" of defendant. Accordingly, at approximately 1:10 a.m., after defendant's third trip with a different individual, the Ford Explorer and the Crown Victoria turned onto Hendry Street

---

[2] Fitzgerald demonstrated the movement for the court. It was not a movement consistent with pulling up one's pants.

and approached the building.[3]

A half-dozen people, including defendant, had congregated outside 37 Hendry Street when the Strike Force approached.  Serra testified that everyone outside the building fled in all directions as the Ford Explorer and Crown Victoria arrived, with one individual going inside the building and shutting the door.  He noticed defendant at the bottom of the stairs to the building, looking left and right, appearing panicked and with his hands under his sweatshirt.  Defendant went up the stairs to the building with his hands remaining underneath his sweatshirt.  Both Serra and Grasso, along with Ross and Boston Police Officer Yee, pursued defendant, who opened the door to the building with one hand and slammed it behind him, striking Grasso in the head.  Serra testified that the officers pushed against the door and opened it far enough to see defendant on the other side attempting to keep it closed.  When they were able to open the front door, Serra and Grasso saw defendant banging on the door to the first floor apartment and yelling to be let in.  I credit Serra's testimony that he was familiar with defendant prior to this evening and knew that he did not live in the building.  As the door to the first floor apartment opened, Grasso grabbed the hood of defendant's sweatshirt and, along with the other officers, toppled with him onto the floor.  Grasso testified that before landing on the ground he saw defendant's right arm reach out to the right and he heard a thud.  To his right he saw a gun on the floor.  The officers subdued defendant

---

[3] Both vehicles were unmarked but equipped with interior police lights.  Serra testified that the vehicles are easily identifiable as police vehicles by the residents on the street.  Some Strike Force members wore plainclothes but carried their badges on chains around their neck and some wore T-shirts which said "Massachusetts Police" or "Youth Violence Strike Force."

and placed him under arrest.

Fitzgerald arrived shortly after the chase.  When he entered the building defendant was on the floor being handcuffed by the officers and the gun and ammunition were on the floor nearby.  Fitzgerald talked to the lessee of the apartment, who consented to a search.  She told Fitzgerald that she did not know defendant and that he did not have a right to be in her apartment.

## II.     Conclusions of Law

"Because Fourth Amendment rights are personal and may not be asserted vicariously, the first inquiry in examining a [F]ourth [A]mendment claim is whether the defendant had a legitimate expectation of privacy in the area searched or the item seized."  United States v. Sanchez, 943 F.2d 110, 112 (1st Cir. 1991) (citing Rakas v. Illinois, 439 U.S. 128, 138-48 (1978)).  Defendant did not have any reasonable expectation of privacy in the apartment, as the lessee did not know defendant and he was there without her permission.  See Minnesota v. Carter, 525 U.S. 83, 89-91 (1998). Moreover, if the gun was in defendant's waistband, he abandoned it by throwing it across the floor.  There is no reasonable expectation of privacy in abandoned property. United States v. Soto-Beniquez, 356 F.3d 1, 36 (1st Cir. 2004) ("It is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property.").  The officers legally entered the apartment in "hot pursuit" of defendant, and the gun and ammunition were in plain view on the apartment floor.  Accordingly, there was no Fourth Amendment violation.  Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); United

States v. Rengifo, 858 F.2d 800, 805-06 (1st Cir. 1988).

Defendant argues that he was "seized" for Fourth Amendment purposes when the officers first arrived at 37 Hendry Street.  However, a seizure does not occur until an individual is physically brought under control or submits to the police officers' show of authority.  California v. Hodari D, 499 U.S. 621, 623-29 (1991).  Accordingly, the seizure did not occur until defendant was restrained on the floor of the apartment, by which time he had already abandoned the gun and ammunition.  Id.  Even assuming arguendo that defendant was seized prior to abandoning the gun, under the totality of the circumstances the officers clearly had a reasonable, articulable suspicion that defendant was engaged in criminal activity, warranting a pursuit and pat-frisk.  United States v. Aitoro, 446 F.3d 246, 252-53 (1st Cir. 2006).

Accordingly, defendant's motion to suppress (Docket # 20) is DENIED.


    June 24, 2008                                    /s/Rya W. Zobel
          DATE                                      RYA W. ZOBEL
                                                UNITED STATES DISTRICT JUDGE